## Tandy K. Young v. Moses Bumpass et al.

A, verbally appointed B his agent to sell a tract of land; B sold the land and took notes for the purchase money, payable to himself instead of A, his principal; B transferred these notes to a stranger, to secure the payment of one of his own liabilities, without the knowledge or consent of A. The purchaser of the land (knowing that the notes for the purchase money had been transferred without the knowledge of A, the vendor,) went to A and informed him that the notes would surely be paid at maturity; that he was anxious to get a deed to the land, and would pay two hundred dollars on the notes, not then due, to get the deed. A objected, saying he had not the notes in possession, and could not make the credit. The purchaser did not disclose the fact that the notes had been transferred by B, the agent of A, but said that B would credit the two hundred dollars on the notes, and if he did not, he, the purchaser, would lose the amount. After much persuasion, A made the deed to the purchaser. The notes were sued on and the money collected by the party to whom they were transferred to secure a liability of B. *Held* by the court, that the fact that the agent of A had abused his trust and deceived him, would be no ground for relief against the purchaser, and that the purchaser was not bound to disclose the fact that the notes had been transferred.

The true definition of *undue concealment,* which amounts to a fraud in the sense of a court of equity, and for which it will grant relief, is the non-disclosure of those facts and circumstances which one party is under some legal, or equitable obligation to communicate, and which the other party has a right, not merely *in foro conscientia,* but *juris et de jure,* to know.

If a man is procured to do an act, even through fraud, the act will be valid if it was such as the law would have compelled him to perform.

Where fraud is charged, it must appear that the party was thereby misled to his prejudice or injury.

Courts of equity do not relieve against deceptive acts, which are followed by no loss or injury.

This bill states that the complainant, Tandy K. Young, was the owner of a half section of land in the county of Tippah, described as the west half of section 35, township 5, range 3 east, and that in the year 1837 he verbally requested his brother, A. M. Young, who resided in said county, to sell said land for complainant. A. M. Young sold the land, in the fall of 1837, to Mo-

ses Bumpass, for the sum of thirteen hundred dollars; and the complainant, in consideration of said sale, received of the said Bumpass, for said land, a note made by one John Wells, and indorsed by said Bumpass and A. M. Young, for eight hundred and thirty-three dollars and thirty-three cents, due on the 25th of December, 1838; also a note made by Bumpass to A. M. Young, for the sum of three hundred dollars, due at the same time; also a note made by said Bumpass to A. M. Young, for one hundred and sixty-six dollars and sixty-six cents, due shortly after date, being 23d November, 1837. It was agreed that complainant should make title to said land when said notes were paid. Complainant directed the note for $166.66 to be handed over to his brother, Milton Young, in exchange for a note of said Milton on Garland Anderson, which complainant held, and which was paid at maturity. In the summer of 1838, Bumpass, who lived in the county of Tippah, called on complainant at his residence in the county of Marshall, and requested complainant to make a deed to the land, as he, Bumpass, wished a title to the land, in order that he might have the same valued and mortgaged for stock in the Mississippi Union Bank. Bumpass also presented complainant a letter from Milton Young, in whose judgment complainant placed much confidence, informing complainant that Bumpass was free from debt and good for his contracts, and so was Wells, and that there would be no danger in making the deed to Bumpass. Under these representations, complainant made the deed to the land. At this time he had never seen the notes taken by A. M. Young for the land, nor did he know that A. M. Young had taken the note for $300, payable to himself, nor that the note indorsed by Wells was assigned to A. M. Young instead of complainant. The whole transaction was made without the knowledge of complainant, except that he was informed of the price the land sold for, and that the parties were good.

At the time the deed was executed, Bumpass paid complainant $200, for which he gave Bumpass a receipt, directing A. M. Young to credit the same on the notes. In July or August, 1838, complainant demanded of A. M. Young the notes taken for said land, and was informed by him that he had placed said notes in the hands of Wm. Y. Gholson, as attorney of Crockett, Read and

Bankhead, on account of a judgment which Gholson had obtained for them against one E. M. Rogers; but that said notes were not assigned, and might be withdrawn at any time, which he promised to do. In March thereafter, complainant received a letter from A. M. Young, stating that there was a misunderstanding between Gholson and himself as to the terms on which he had placed the notes in Gholson's hands, but assuring complainant that the money due on the notes would be paid to nobody but complainant. In June thereafter, A. M. Young died, in Jackson, without informing complainant of the nature of the misunderstanding between himself and Gholson. Suit was instituted on the note indorsed by Wells, in the name of Bumpass, for the use of Crockett, Read and Bankhead, and judgment obtained against Wells for $961.10, damages and costs, and on the note of Bumpass, in the name of Crockett, Read and Bankhead, and judgment obtained thereon against Bumpass for $323.34, in December, 1839, and executions issued on the same in favor of Crockett, Read and Bankhead. Complainant never saw the notes until after suit was commenced. After the death of A. M. Young, Gholson's receipt for the two notes in question was found among Young's papers, in the following language: "The above notes are to be held by me as security for, and when collected are to be applied to, the payment of a judgment obtained in the circuit court of Tippah county in favor of Crockett, Read & Bankhead, against E. M. Rogers, at the November term, 1837. Pontotoc, 27th February, 1838." Complainant charges that the transfer of said notes was without authority and fraudulent, and that at the time Bumpass procured the deed for the land, he knew this transfer had taken place, and fraudulently suppressed the fact from complainant, assuring him at the same time that the notes would be punctually paid at maturity. The bill prayed an injunction, restraining the sheriff from paying the money collected on the executions to any person but complainant, or a decree cancelling the deed of complainant to Bumpass for the land, and the injunction was granted.

The answer of Bumpass admits that he purchased the land, and gave the notes as stated in complainant's bill; admits that two of said notes were placed in the hands of W. Y. Gholson, for the benefit of Crockett Read & Bankhead, by A. M. Young; admits

that he has a deed to the land in question, but denies all fraud ;—states that he took a title bond from A. M. Young at the time the notes were delivered, conditioned for a title when the notes were paid; admits that he applied to complainant for a title to the land, for the purpose of taking stock in the Mississippi Union Bank; that he presented complainant a letter from his brother, Milton Young, requesting him to make a title to Bumpass, and assuring complainant that the notes would be paid at maturity; admits that Bumpass knew that the two notes were in the hands of Gholson, but states that A. M. Young told him that he would get them back in a short time, and that but for his carelessness he would have had them before that time, and that said Young would credit any payment that Bumpass might make on said notes. This took place about the first of August, 1838. Defendant denies all knowledge of any special endorsement of said notes, or transfer of the same; but believed them to be the property of Young, until they were sued for by Crockett, Read and Bankhead. Defendant stated all these facts to complainant at the time the deed was made and complainant said his brother Milton had told him the notes were in the hands of Gholson, but that they could be had at any time, and that complainant would credit the payment then made of $200 on the three hundred dollar note. Denies all persuasion or entreaty of complainant to make said deed, and states that the same was made unhesitatingly and willingly. Defendant further states that he has paid off the full amount of the thirteen hundred dollars, except the three hundred dollar note sued on by Crockett, Read and Bankhead, and on which execution has issued, and must soon be paid. Defendant denies all manner of unlawful confederacy, combination and fraud charged in said bill.

The answer of defendant Gholson states, that at the November term, 1837, of the circuit court of Tippah county, he recovered a judgment in favor of Crockett, Read and Bankhead against Elijah M. Rogers, for about three thousand dollars ; that soon after judgment was obtained, A. M. Young came to Gholson and told him that although this judgment was not directly against himself, he was bound to pay it by an agreement with defendant Rogers, who was his partner in business. Some time subsequent to this, A. M. Young came to Gholson's office and handed him the two notes in

controversy, for which he receipted. The receipt is filed as an exhibit, and shows that the proceeds of said notes were to be applied to the payment of said judgment, and such was the understanding of the parties at the time the same was given. In consideration of these notes and the promises made by A. M. Young to pay the judgment, Gholson did not press the execution on the same, whereby said Rogers was enabled to place some of his property beyond the reach of an execution, and that said Rogers is now insolvent.

- The deposition of Eliza Standback states, that she was present in August, 1838, when Bumpass came to the house of complainant to get a deed to the land; that Bumpass was very anxious to get the deed, to put the land in the Union Bank. Young objected to giving the deed, because he had not the notes in possession, nor had he seen them, and because one Doctor Sprewell, of Alabama, had an undivided interest in the land, and that complainant could not convey his interest. Bumpass offered to pay $200 on the notes not then due as an inducement to complainant to make the deed; told him the notes were in the possession of A. M. Young, that he had full confidence in A. M. Young, and knew he would credit the notes with the amount he offered to pay; and if he did not, he, Bumpass, would lose the amount, and not look to complainant for the same. After much solicitation for twenty-four hours, complainant consented to make the deed, and received the $200. Bumpass repeatedly stated that the notes were in the hands of A. M. Young. The deposition of Milton C. Young proves the same facts.

The deposition of Milton Young proves that Bumpass told him that he was on his way to Marshall county, to see if Tandy K. Young would make him a deed to the land in question; that Bumpass requested witness to write a letter to complainant, stating that he might depend on what Bumpass would say on the subject of the title to the land and the payment of the notes. Witness did write to complainant as desired by Bumpass. Witness knew the notes were in the hands of Gholson, and was about to state the fact in the letter, but Bumpass objected to it, and said he would inform complainant of that fact. Witness did not therefore state the fact in the letter. Bumpass took the letter to complainant, and procured the deed. On his return he told witness that he had

21*

much difficulty in getting the deed; that it took him two days and nights hard persuasion, and that he did not dare to tell complainant that the notes were in the hands of Gholson, lest he should not get the deed.

The defendants moved to dissolve the injunction on bill and answers.

Wm. Y. Gholson, for the motion.

It is submitted that there is no difference in principle between a delivery of notes, as in this case, and an actual transfer of them by purchase. They went entirely out of the control of the holder, and were endorsed by him. Even if the consideration that when collected they were to be applied to the payment of a debt for which the holder was bound, were not sufficient, the forbearance granted at his instance certainly was.

The doctrine is well settled, that the assignee of a chose in action takes it subject to all the equity of the original obligor or debtor, at the time of the assignment; but not to a latent equity in a third person against the assignor. See Murray *v.* Lylburn, 2 Johnson's Chy. Rep. 442.

He who trusts most must bear the loss. If the complainant was entitled to the notes, he allowed his brother to take and hold them so as to be unable to use them as his own, and in such a way that the utmost diligence could not have brought those who received the notes to any knowledge of complainant's right. The notes were on their face when presented to defendant Gholson, the legal property of A. M. Young, one of them being payable to him, and the other specially endorsed to him, as will appear from the description of the notes in exhibit B.

It is submitted that the injunction in this case should be dissolved, so as to permit the defendants Crockett, Read and Bankhead, to collect their money.

Chalmers contra.

Complainant's solicitor has examined the abstract of defendant's solicitor, and finds it substantially correct, except in the abstract of the account, page 2 and 3, foot and top. The answer states respondent's "belief," that by the time given on the judgment *v.*

Rodgers, he was enabled to move some of his property, and "belief" that Rodgers is insolvent and respondent will be unable to recover; while abstract states those facts positively, deemed by complainant material discrepancies. But complainant contends that if stated either way, the responses are not in answer to any allegation with bill, and unsupported by evidence, are immaterial in this stage of the case. They are facts which are stated, and intend to give to the transaction a totally different character than the one fixed on it by the receipt (marked exhibit A. B.) of the bill, and as such should have been clearly and explicitly proved affirmatively.

Complainant contends that there is a "difference in principle between a delivery of notes as in this case, (per exhibit B. and answer,) and an actual transfer of them by purchase;" and this difference is so strong as to change totally the character of the transaction and the rights acquired by it. In the case of a purchase, the holder obtains a legal title; in the other he is only a trustee, and his title only equitable.

The case from 2 Johns. Chy. Rep. 442, was the case of a purchase of a bond and mortgage, *bona fide*, for valuable consideration, without notice, and as such was good against a latent equity in a third person, and applicable to the case first above put. But is that this] case? The receipt of Gholson shows that he was only a trustee, and his client's interest an equitable right to the proceeds which might be realized from the notes. They gave Rodgers no discharge of the judgment against him; they did not acknowledge it as a payment, nor do they stipulate or show they gave any consideration for them by which a legal title thereto was to be acquired. The delay granted Rodgers was in order to acquire, not legal rights, but further assurances, securities, or in other words, equities—an equitable right to have said notes collected and applied in discharge of their judgment *v.* Rodgers. This delay may have been beneficial to Rodgers, but defendants were in no wise injured, nor the force and effect of their judgment in any way lessened. Young had no interest in the delay; the judgment was not against him, and the statement of the answer, that he thinks Young told him he had to pay the judgment, as unsustained by proof, is not responsive to the bill, and is of no weight as the case now stands. The case made by the answer,

so far as it is responsive to the bill, gives to respondents a mere equity; but what is that case when the bill and answer are taken together? The whole transaction of Young and Gholson was a gross fraud upon the rights of complainant on the part of A. M. Young, and as to the rights of complainant utterly void.

But it is said that he who trusts most must suffer most. This principle only applies when equities are equal, and one of the parties has obtained a legal advantage. Are the equities equal here? What did defendants give, and what have they lost by the receipt of the notes? Literally nothing. What principle of law or equity will sanction the acts of faithless agents, who will deliver over the property of their employers as security to their own creditors? Not one.

The conduct of A. M. Young was a fraud and void; no title was communicated by it; if any, it was but an equitable one, younger than complainant and not equal, and the older and better must prevail; and this complainant contends that the court will not dissolve the injunction, which is only to restrain the sheriff from paying over the money until this court has determined to whom in equity and conscience it belongs; which cannot safely be done until the gross fraud set out in the bill has been fully sifted, by the accounts of all the parties and the proof. Want of time and books since the filing of the answer have disabled me from furnishing the court with authorities.

The Chancellor dissolved the injunction, and the case was set down for hearing on the bill, answers and depositions.

The CHANCELLOR.

The defendant purchased a tract of land from A. M. Young, acting as the agent of the complainant, and agreed to give $1,300 for it, and at the same time transferred to A. M. Young a note on John Wells for $830 33, and gave his own notes for the remainder, payable to A. M. Young. It seems that $166 66 of the purchase money was paid to the complainant shortly after the sale of the land. A. M. Young gave, as agent, his bond to make title when the notes should be paid. In the summer of 1838, Bumpass, being desirous of taking stock in the Union Bank, and wanting to

Tandy K. Young *v.* Moses Bumpass *et al.*

perfect his title for that purpose by getting a deed from the complainant, procured Milton Young to write a letter to the complainant, assuring him of the solvency of the defendant, and of his belief that the notes would be paid at maturity, and that there was no danger in making the deed to Bumpass. Bumpass accordingly procured the deed by paying $200, which was some months in advance of the maturity of his notes. Bumpass, at the time of procuring the deed, was informed that the notes made and indorsed by him had been placed in the hands of W. Y. Gholson, esquire, by A. M. Young, the agent, but was assured at the same time by A. M. Young that the property in the notes was not parted with, and that they were still under his control and would be taken back, and this Bumpass must evidently have believed, or he would not have paid the $200. This information was not disclosed to T. K. Young, when Bumpass applied for and procured a deed for the land. It turned out afterwards, that the notes had been actually transferred by A. M. Young, and that the transferees held them in exclusion to the claim of the complainant. It appears that all or nearly all of the money has been paid up by Bumpass. T. K. Young now files this bill to set aside and cancel the deed made to Bumpass, upon the ground that Bumpass fraudulently suppressed the fact, that A. M. Young had placed the notes in Gholson's hands, which fact he knew when he applied for the deed. These facts are fully proved, and the only question is, do they entitle the complainant to the relief asked by the bill? Suppose Bumpass had communicated these facts to T. K. Young, would Young's knowledge upon the subject have in any way affected the right of the defendant to call for a completion of his contract? Surely not. The fact that his agent had abused his trust and deceived him, would certainly be no ground for relief against the defendant. Judge Story says, "the true definition of undue concealment, which amounts to fraud in the sense of a court of equity, and for which it will grant relief, is the non-disclosure of those facts and circumstances which one party is under some legal or equitable obligation to communicate, and which the other party has a right, not merely *in foro conscientiœ*, but *juris et de jure*, to know." 1 Story Eq. 216. Was Bumpass under any obligation, legal or moral, to disclose his knowledge in rela-

tion to the transfer of the notes? I think not; because Young's obligation to Bumpass to perform his contract made by his agent would still have remained unimpaired, unless a knowledge of the fact itself would have impaired the right of Bumpass to call for a performance of his contract; then certainly he was under no obligation to disclose it. If a man is procured to do an act, even through fraud, yet the act will be valid if it was such as the law would have compelled him to perform. Where fraud is charged, it must appear that the party was thereby misled to his prejudice or injury. Courts of equity do not relieve against deceptive acts, which are followed by no loss or injury. 1 Story's Eq. 212.

The complainant's bill must be dismissed at his costs.